UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-60776-CIV-ALTONAGA/Goodman

**UNITED STATES OF AMERICA**,
*ex rel* Rafael Troncoso,

    Plaintiff,
v.

**REGO INTERNATIONAL, LLC**, *et al.*,

    Defendants.
_____/

## ORDER

**THIS CAUSE** came before the Court on Defendants, Kinetic, Inc. and Rego International, LLC's Motion to Dismiss First Amended Complaint [ECF No. 64], filed March 23, 2018. On April 6, 2018, Relator, Rafael Troncoso, filed an Opposition to Defendants' Joint Motion to Dismiss [ECF No. 68]. Defendants have not filed a reply memorandum addressing Relator's arguments in opposition. On April 20, 2018, Relator filed a Notice of Settlement [ECF No. 69], requesting the Court dismiss Relator's claims against Kinetic. On April 23, 2018, the Court entered an Order [ECF No. 70] dismissing Kinetic; thus, the Motion is moot as it pertains to any arguments raised by Kinetic (*see* Mot. 1–8).[1] The Court has carefully considered the parties' written submissions, the record, and applicable law.

### I. BACKGROUND

The First Amended Complaint ("FAC") [ECF No. 26] describes a scheme Rego developed to recruit and pay physicians to make referrals for braces, transcutaneous electrical nerve stimulation units ("T.E.N.S. units"), and compound creams, resulting in millions of dollars

---

[1] While Kinetic and Rego jointly filed the Motion, Defendants provide "separate memoranda of law." (Mot. 1). Therefore, the Court only considers Rego's "Argument and Memorandum of Points and Authorities in Support of Motion to Dismiss." (*Id*. 8 (capitalization omitted); *see also id*. 8–13).

of false claims being paid by the United States. (*See generally id.*). As part of the scheme, Rego conspired with Kinetic and RX Pro Pharmacy Compounding. (*See id.* ¶¶ 41, 53). First, Rego offered physicians payments for referrals — some of which were for Medicare and Medicaid patients. (*See id.* ¶¶ 36, 44). Then, Kinetic and RX Pro Pharmacy would make those payments. (*See id.*). Unaware of the illegal referral payments, the United States caused numerous false claims submitted by Kinetic and RX Pro Pharmacy to Medicare and Medicaid to be paid. (*See id.* ¶¶ 41–42, 53–54).

Rego "describes itself as a business that specializes in 'Revenue Enhancement programs for Healthcare Professionals and Institutions.'" (*Id.* ¶ 12). Rego recruits physicians to participate in its "stock and bill" program, which it touts as a "legally compliant way to make 'passive income.'" (*Id.* ¶ 16; *see also id.* ¶ 2). Rego does not enter into these agreements with physicians directly, but instead solicits agreements for Kinetic and RX Pro Pharmacy. (*See id.* ¶¶ 13, 36, 44).

Under the "stock and bill" program, physicians are provided with an inventory of braces by durable medical equipment ("DME") providers, which the physicians then prescribe to their patients. (*See id.* ¶ 17). The patient is effectively given little or no choice regarding where to buy the brace, purchasing it at the physician's office from Kinetic. (*See id.* ¶ 18). The physician's staff has the patient fill out paperwork allowing the DME provider to bill the patient's insurance company directly for the brace, so the patient does not pay Kinetic out of pocket. (*See id.* ¶¶ 18–19).

The DME provider can then charge the insurance carrier much higher prices for the braces than the patient would pay if she had purchased the same brace at a pharmacy because by billing an insurer directly, the DME provider may utilize the maximum allowable rate set forth in

the contract between the insurance company and the Centers for Medicare and Medicaid Services. (*See id*. ¶ 21). Rego has its sales staff pick up prescriptions and corresponding insurance paperwork from physicians' offices and restock physicians' inventory. (*See id*. ¶ 20). Rego is paid a commission for each referral the pharmacies receive under the "stock and bill" contracts it generates. (*See id*. ¶ 15).

Physicians are paid a monthly "fitting fee" by the DME provider they contract with. (*See id*. ¶ 22). The more expensive the brace, the higher its referral value. (*See id*. ¶ 23). The agreements typically pay $75 per back brace, $65 per knee brace, and similar prices for walkers and wrist braces. (*See id*.). The monthly "fitting fee" is usually set the first three months of the program, and is decided by averaging the number and type of braces the office refers per month. (*See id*. ¶ 24). The fee has nothing to do with whether the physician or physician's assistant actually fits a patient for a brace. (*See id*. ¶¶ 26–27). If a physician does not meet his or her monthly average, the payments stop and the contract is terminated, or the fee is revised down. (*See id*.). The monthly fitting fee is typically in the range of $1,000 to $2,500 per month. (*See id*. ¶ 25).

In addition to the fitting fee, physicians' offices are also paid a monthly administrative fee and rental fee for storing the braces. (*See id*. ¶ 28). These fees increase monthly payments to participating physicians by approximately $100. (*See id*.). Additionally, Rego directs its salesforce to make cash payments to office administrators, and takes participating physicians to expensive meals and events in order to "grease the wheels and keep the illegal referral network operating smoothly." (*Id*. ¶ 4).

In addition to the "stock and bill" program, Rego solicits physicians to prescribe expensive compound creams sold by RX Pro Pharmacy and T.E.N.S. units sold by Kinetic. (*See*

*id*. ¶¶ 3, 29). Rego offers physicians a $25.00 payment from RX Pro Pharmacy for each compound prescription submitted to RX Pro Pharmacy. (*See id*. ¶ 14). Rego's salesforce also routs referrals of T.E.N.S. units to Kinetic. (*See id*. ¶ 29). Physicians are paid an additional $100 if they prescribe a T.E.N.S. unit with a back brace. (*See id*. ¶ 30). The payments to physicians are only made, however, if the prescriptions are submitted to and filled by RX Pro Pharmacy and Kinetic. (*See id*.).

Relator formerly worked as a salesperson for Rego and its associated medical equipment providers. (*See id*. ¶ 6). He gained knowledge of the referral scheme through his work for Rego, including recruiting physicians and managing physicians' accounts. (*See id*. ¶¶ 6, 34). Relator also had conversations with Bill Rego, the principal of Rego, about how to bill certain claims to comply with Medicare billing guidelines. (*See id*. ¶ 34).

Relator brings claims under the *qui tam* provision of the False Claims Act ("FCA") for Rego's submission of false claims to Medicare and Medicaid for braces (Count I), and for compound creams and T.E.N.S. units (Count II). (*See generally id*.). Relator also alleges Rego violated the Anti-Kickback Statute ("AKS"), *see* 42 U.S.C. § 1320a–7b, by offering referral payments to induce physicians to prescribe braces, T.E.N.S. units, and compound creams from Kinetic and RX Pro Pharmacy. (*See* FAC ¶¶ 37, 46).

In its Motion, Rego argues the claims alleged do not satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). (*See generally* Mot.). Rego also requests the Court grant the Motion with prejudice since Relator has already amended his complaint. (*See id*. 12).

## II. LEGAL STANDARD

A complaint brought under the FCA must be pled in accordance with Federal Rule of Civil Procedure 9(b). *See Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1324 (11th Cir. 2009); *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1309–10 (11th Cir. 2002). A complaint satisfies Rule 9(b) by providing "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Hopper*, 588 F.3d at 1324 (internal quotation marks and citation omitted). "[U]nless a relator alleges with particularity that false claims were actually submitted to the government, . . . dismissal is proper." *United States v. HPC Healthcare, Inc.*, No. 16-16670, 2018 WL 526039, at *3 (11th Cir. Jan. 24, 2018) (alterations added; citation omitted). "The key inquiry is whether the complaint includes 'some indicia of reliability' to support the allegation that an actual false claim was submitted." *Id.* (citation omitted). "[I]ndicia of reliability [are] sufficient where the relator alleged direct knowledge of the defendants' submission of false claims based on [his] own experiences and on information [he] learned in the course of [his] employment." *Id.* (alterations added; citation omitted).

## III. ANALYSIS

The AKS prohibits "knowingly and willfully soliticit[ing] or receiv[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly" in return for referring an individual to purchase a good or service "for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a–7b(b)(1) (alterations added); *see also Osheroff v. Humana Inc.*, 776 F.3d 805, 808 (11th Cir. 2015). Since compliance with the AKS "is a condition of payment for Medicare and Medicaid, claims submitted for services rendered in violation of these statutes 'can form the basis of

liability under the FCA.'" *United States v. Marder*, 208 F. Supp. 3d 1296, 1316 (S.D. Fla. 2016) (alteration removed) (quoting *United States v. Baycare Health Sys.*, No. 8:14-CV-73-T-23EAJ, 2015 WL 4878456, at *1 (M.D. Fla. Aug. 14, 2015)).

Rego argues Relator fails to satisfy the Rule 9(b) pleading standards because he does not describe or identify specific instances of (1) when kickbacks were paid or received; (2) who received or paid kickbacks to influence physicians to prescribe drugs or DME; (3) where the scheme took place; and (4) whether claims were submitted to the government for reimbursement. (*See generally* Mot.). Rego argues the FAC should be dismissed because Relator does not identify any specific instance in which a kickback was paid to a physician who was influenced to prescribe medical equipment or drugs, which were then paid for with government funds. (*See id*. 11–12 (collecting cases)). Furthermore, Rego points out there are no specifics about who at Kinetic and RX Pro Pharmacy submitted drug and medical equipment claims, or the circumstances under which they did so. (*See id*. 12 (citation omitted)).

According to Relator, he is not required to plead the "who, what, where, why" in his FAC given the Eleventh Circuit's more flexible standard for FCA cases. (*See* Opp'n 7–8). Instead, Relator states he may "leave out particularities of the submissions of a false claim if the complaint alleges personal knowledge or participation in the fraudulent conduct." (*Id*. 8 (quoting *United States ex rel. Matheny v. Medco Health Sols., Inc*., 671 F.3d 1217, 1230 (11th Cir. 2012)) (other citation omitted)). Relator points to several Eleventh Circuit opinions finding when a relator is an insider with firsthand knowledge of violations, he or she provides sufficient indicia of reliability to satisfy the Rule 9(b) standard without going into detail about each of the false claims presented. (*See id*. 9 (citing *United States ex Rel. Walker v. R & F Props. of Lake Cty.,*

*Inc.*, 433 F.3d 1349, 1360 (11th Cir. 2005); *United States ex rel. Hill v. Morehouse Medical Associates, Inc.*, No. 02-14429, 2003 WL 22019936, at *4–5 (11th Cir. Aug. 15, 2003))).

In its Motion (*see* Mot. 12–13), Rego relies on *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180 (5th Cir. 2009), where the Fifth Circuit acknowledged a complaint may survive Rule 9(b) scrutiny by alleging details of an overarching scheme to submit false claims if "paired with reliable indicia that lead[s] to a strong inference [] claims were actually submitted." *Id*. at 190 (alterations added). Rego does not address whether Relator's experience working for it as a salesperson is sufficient to satisfy the Rule 9(b) standard. (*See generally* Mot.). Curiously it did it see fit to reply to Relator's argument (*see* Resp. 10–11) his experience does suffice.

Relator states he worked as a salesperson for Rego (*see* FAC ¶ 6), and was responsible for managing physicians' accounts and recruiting physicians (*see id*. ¶ 34). The FAC describes other responsibilities of Rego's sales staff as including: making cash payments to office administrators (*see id*. ¶ 4), picking up prescriptions and correspondence paperwork from physicians (*see id*. ¶ 20), restocking physicians' inventory (*see id*.), and learning how to bill certain claims to comply with Medicare guidelines (*see id*. ¶ 34). As such, Relator alleges working for Rego gave him "personal knowledge of false claims for braces, T.E.N.S. units, and compound creams submitted to Medicare." (*Id*.).

As an insider at Rego, engaged in the recruitment of doctors and the management of physicians' accounts, Relator shows ample indicia of reliability supporting his allegations that Rego's scheme led to the submission of false claims. *See Hill*, 2003 WL 22019936, at *4–5 (finding relator's status as an employee in the billing and coding department provided the indicia of reliability necessary in alleging a fraudulent billing scheme). Thus, while Relator does not

identify particular claims or the "who, what, where, why" as to each violation of the AKS, he has provided the requisite indicia of reliability to satisfy Rule 9(b)'s pleading requirements. *See R & F Props. of Lake Cty., Inc.*, 433 F.3d at 1360 (holding Rule 9(b) was satisfied because the relator was a nurse practitioner required to bill under a doctor's provider number with personal knowledge of the billing practices that led her to believe fraudulent claims were submitted to the government). Consequently, both FCA claims (Counts I & II) against Rego survive.

## IV.  CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED AND ADJUDGED** that the Motion **[ECF No. 64]** is **DENIED**.

**DONE AND ORDERED** in Miami, Florida, this 15th day of May, 2018.

　

**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc:　counsel of record